O. J. "PINKY" CLEMMER v. STATE.

No. A-8696. Jan. 11, 1935.
(40 Pac. [2d] 37.)

Potter & Potter, for plaintiff in error.

J. Berry King, Atty. Gen., Smith C. Matson, Asst. Atty. Gen. (J. H. Lawson and O. B. Martin, of counsel), for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter for convenience referred to as the defendant, was by information charged with murder, tried and convicted of manslaughter in the first degree, and sentenced to serve a term of 10 years in the state penitentiary.

An abstract of the testimony on behalf of the state shows that on the 9th of August, 1932, Mr. and Mrs. Lee Jones had a number of parties at their apartment in Ponca City for a farewell party to Miss Katherine Bateman. The defendant attended this party in company with Miss Bateman.   During the evening Miss Anna Ingold Mitchell was invited to where the party had assembled upstairs and took a drink of whisky.   She remained a few minutes, and went downstairs to her apartment.  The testimony of Miss Mitchell shows that, while she was upstairs, the defendant and Katherine Bateman were in another room quarreling over the attention the defendant had been paying Erma Mueller.  At the time of this party the wife of the defendant was supposed to be in California, and returned a few days after the party at the Jones home.

It is further shown that about 30 days before the night of this party the defendant had driven to Oklahoma City

and brought the deceased, Miss Bateman, with him; that, while deceased was in Ponca City, deceased and defendant were together most of the time, the deceased spending much of her time at defendant's home. It is further shown that deceased was contemplating the return to her home in Oklahoma City the day after this party.

Anna Ingold Mitchell stated she lived at 712 North Osage street, in Ponca City, on August 9, 1932. Mr. and Mrs. Lee Jones occupied the upstairs apartment in the same building. That she had known the defendant for only a short while. She met the deceased July 24, 1932, at a birthday party in the Jones apartment. Witness further stated:

"On August 9, 1932, the night of the trouble, Mr. and Mrs. Lee Jones, Mr. Tindall, Mr. Clemmer, Miss Bateman, and myself were in the Jones apartment. I heard a conversation between the deceased and defendant; they were arguing over a girl, Miss Erma Mueller; Miss Bateman called Clemmer a vile name and he asked her not to say that any more; she accused him of going with this girl, and this girl calling the law to his house and she and he caught the girl. At the time of this argument they were sitting in Mrs. Jones' bedroom. I went from my apartment up the front stairs to the Jones apartment, and when I left I went back to my bedroom and went to bed. There is a telephone downstairs near Mrs. Faulk's room. The phone rang and Mrs. Jones was called to the phone. Miss Bateman was also at the phone. I called Mrs. Jones and it was a woman's voice answered, but I did not recognize it. Shortly after this phone call Lula Gardner came to the Jones apartment. I don't know who came with her. Some time after this conversation over the phone, Miss Bateman and Mrs. Jones left the apartment. They went toward the drug store, returning in a few minutes. This was about 10 o'clock in the evening, and before Miss Gardner arrived. I went to bed early that night and got up and went up to the Jones apartment for a short while.

Shortly after the two women went back upstairs, about 10:30, I heard Miss Bateman and Clemmer arguing again. Miss Bateman called Clemmer a vile name, and he struck her, and she told him to leave her alone, 'Don't do that'; they were scuffling and he slapped her several times, and I heard a hit and a fall, and Mrs. Jones said, 'My God, you have killed her.' She said, 'Oh, Pinky, you have killed her.' The scuffling started in the bedroom and ended in the kitchen. I know the voice of Mrs. Bonnie Jones quite well. This crash where something fell was in the kitchen. There was a lapse of a few minutes, and the lights went out and the parties left the Jones apartment by the backstairs. I did not hear any more disturbance after the parties left. I was up to the Jones apartment the next morning and helped Mrs. Jones prepare breakfast. Fred Tinsdall is Mrs. Jones brother-in-law.

"While I was there Miss Nina Miles arrived; she said her sister was in the hospital. Mr. Clemmer and Mr. Palmer came in a few minutes later. They came up the backstairs and went into the living room, that is, the center room. I stayed in the kitchen. If you stand by the built-in cabinet you can see the southeast corner of. the living room. I heard the parties talking. Mr. Clemmer was discussing the accident and how it happened, said Miss Bateman was supposed to have fallen down the stairs, that is the way it was supposed to be told. He said this several times. * * * Mrs. Jones told me that Miss Bateman and others had taken their stockings off that night at the party and she came up to get the shoes."

Grace Tucker in substance stated she lived in Ponca City, at 701 North Osage street. She knew the house known as 712 North Osage. It was west of her home. On the night of August 9, 1932, she was sleeping out in the yard; she did not know who lived at 712 North Osage; about 11:30 o'clock at night she heard a noise which woke her up. She heard two screams from a woman. These screams seemed to be from upstairs across the street, which was an apartment house at 712 North Osage. She heard a

woman's voice say, "Please don't do that," and then another scream. She heard a blow—a lick. The lights went out. In a few minutes thereafter she heard two cars leave from the alley; they went rapidly in opposite directions.

Dr. L. C. Vance stated he was called to see the deceased at the Pinky Clemmer home some time about 10 or 11 o'clock the morning following the night she received the blow, and found she had a fractured skull and ordered her admitted to the Ponca City Hospital; that she lived five days after that time, but never regained consciousness. The fracture was on the left side near the ear; it was irregular and ran upward or posterior, about five inches long. There was no bleeding from the fracture; there was a swelling. The left ear was normal and not scratched or smashed. There was a bruise on her left hand, and a very small hematoma on the left or right hip. This particular trauma was caused by the application immediately from the fracture. That it could not have been caused by the application of force or pressure on any other portion of the cranium, and there were no bruises on the forehead.

The witnesses for the defendant admit they were at the home of Lee Jones and his wife, who is known as Bonnie Jones, the night of the alleged difficulty; that Anna Ingold Mitchell, who lived in the apartment downstairs, came to the Jones apartment, where the party was being held, and remained for awhile and returned to her rooms downstairs. The defendant and the witnesses he called say there was no argument or trouble between the deceased and the defendant in the Jones apartment. They state some of the women had been dancing, and deceased was without shoes or stockings at the time they prepared to leave the house. The defendant clearly contradicted the testimony of Anna Ingold Mitchell.

The testimony of the defendant tends to show, that as they were getting ready to leave the Jones apartment the deceased left by the back stairway before the others, and must have fallen from the stairs to the ground below and received the injury from which she died several days later. The defendant in his testimony, and the witnesses who testified for him, say when they missed the deceased they were of the opinion she had gone to one of the cars, and, when they went to the cars and looked for her, and finally came back to the stairway, they found the deceased on the ground near the stairway unconscious and unable to talk. The defendant states he took the deceased up and took her to his car and then took her to his home, where he placed her on the bed and there kept her, in this unconscious condition, until the next morning about 9 or 10 o'clock, when the sister of the deceased came to the home for the purpose of learning if the deceased was ready to return to Oklahoma City, as the testimony shows she expected to return to her home in Oklahoma City that morning. Dr. Vance was then called, and made an examination and ordered the deceased sent to the hospital. It is positively denied by the defendant and witnesses who were present at the party that any difficulty arose between the defendant or that the defendant struck the deceased with his fist, or a bottle, or any other instrument.

The testimony discloses that the wife of the defendant was in California and was expected home within a day or two after the deceased was injured; that deceased had been in Ponca City for a number of days, having gone there with the defendant, and a portion of the time she had been there she stayed at the defendant's home. It is further shown that, when they were looking for the deceased, as the witnesses for the defendant claim they did, it was dark and one of the parties struck a match. Anna

Ingold Mitchell testified she was at the Jones home the next morning after the party the night previous, and that defendant and other parties came in and discussed the question of the condition of the deceased, who was then alive, and defendant stated that it must be told she fell down the backstirs and injured herself.

The defendant has assigned 15 errors alleged to have been committed by the trial court. In his argument in support of the errors assigned the defendant makes this statement:

"The defendant, Oscar Clemmer bases his appeal and his hope of reversion or modification in this case principally upon the ground of the insufficiency of the evidence to sustain the conviction imposed upon him."

The defendant, after making the foregoing statement, argues the question of the weight of the evidence, and places great stress upon the fact that witnesses who were present at the Jones home that night positively deny there was any trouble between the deceased, Miss Bateman, and Mr. Clemmer, the defendant.

In considering the testimony of the state and the defendant, it is important to note the circumstances surrounding the party at the Jones home and the actions of the defendant and those with him from the time they arrived at the Jones home until Dr. Vance was called the next morning to treat the deceased. Every circumstance from the time the state's testimony shows there was a disturbance at the Jones apartment up to the time Dr. Vance was called, the next morning, indicates a desire upon the part of the parties to keep secret the fact that the deceased was injured. We cannot believe the testimony of the defendant is true, and the jury evidently did not believe it to be true when it rendered its verdict of guilty.

The most reasonable, humane, and natural thing that would have been done by the parties, if the deceased had fallen, as the defendant states she did, from the stairway and injured herself, would be to have immediately rushed her to the hospital and had an examination made to ascertain whether or not she had received serious injuries, but this was not done. She was taken to the home of the defendant, whose wife was away from home, and kept there all night in an unconscious condition, without medical aid, and without any effort on the part of the defendant or others with him to ascertain her condition, or to try to revive her from the unconscious condition she was in. The statement as to how the injury occurred and the subsequent actions compel this court to say it does not believe the defendant and his witnesses were telling the truth. Mrs. Tucker, who testified for the state, heard a woman scream, and heard her say, "Please don't do that;" immediately thereafter she heard a noise like something fall, and shortly thereafter the lights went out and two cars left the Jones apartment hurriedly going in opposite directions.

The defendant cites no authorities in support of his assignments, and the only question to be determined by this court, on the record presented, is the question, Is there any competent testimony to sustain the verdict of the jury? The question of the competency of the evidence has been before this court so often that it seems useless to cite authorities. In Ostendorf v. State, 8 Okla. Cr. 360, 128 Pac. 143, in the fourth paragraph of the syllabus, this court held:

"Before this court will reverse a conviction upon the ground that the verdict of the jury is contrary to the evidence, we must find that there is no testimony in the record from which the jury could rationally conclude that

the appellant was guilty, unless it appears from the record that the jury were influenced by improper motives in arriving at their verdict. This has always been the rule of this court."

There is nothing in the record to show that the jury was influenced by improper motive, passion, or prejudice.

In Pickett v. State, 35 Okla. Cr. 60, 248 Pac. 352, in the syllabus, this court held:

"Where the evidence and the reasonable and logical inferences and deductions to be drawn from it are sufficient to convince the jury beyond a reasonable doubt of the guilt of a defendant, this court will not disturb the verdict for insufficiency." Underwood v. State, 36 Okla. Cr. 21, 251 Pac. 507; Choate v. State, 37 Okla. Cr. 314, 258 Pac. 360.

In Strong v. State, 42 Okla. Cr. 248, 275 Pac. 385, this court held:

"A motion for new trial, based on an allegation that the evidence does not support the verdict of the jury, is addressed, first, to the sound discretion of the trial court, who has seen and heard the witnesses testify, and who must necessarily know a great deal more about many facts and circumstances produced at the trial, which cannot be written into a record, than an appellate court can by reading the record after it is written. And when a trial court has considered and passed upon such an issue, it comes to this court only on the proposition that as a matter of law the verdict is contrary to the evidence." Coats v. State, 56 Okla. Cr. 26, 32 Pac. (2d) 955.

The jury is the exclusive judge of the weight of the evidence, and, if there is a clear conflict in the evidence, or it is such that different inferences can properly be drawn from it, this determination will not be interfered with unless it is clearly against the weight of the evidence or appears to have been influenced by passion or prejudice.

The jury heard the evidence and evidently believed the testimony of the state's witnesses upon the conflicting points, and disbelieved the defendant's testimony. There is sufficient evidence to sustain the verdict of the jury and the judgment.

The defendant in his brief assigns as one of the grounds for a new trial newly discovered evidence. In Moseley v. State, 12 Okla. Cr. 402, 157 Pac. 708, this court held:

"A motion for a new trial upon the ground of newly discovered evidence is addressed to the sound discretion of the trial court, and its ruling thereon will not be disturbed, except for an abuse of this discretion; the presumption being that the discretion was properly exercised."

It is not an abuse of discretion for the trial court to overrule the motion for a new trial if such evidence is unimportant or cumulative. The court did not err in overruling the motion of the defendant for a new trial based upon the ground of newly discovered evidence.

The defendant was accorded a fair and impartial trial. The court correctly advised the jury as to the law applicable to the facts. There are no errors in the record warranting a reversal. The judgment of the trial court is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.