## H. L. JONES v. STATE.

No. A-9161.   June 4, 1937.
(69 Pac. [2d] 71.)

Francis K. Trimble, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, P. J. The plaintiff in error, hereinafter referred to as the defendant, was by information charged with rape in the second degree; was tried and found guilty by a jury. The jury failing to agree upon the punishment the court sentenced the defendant to be confined in the state penitentiary for a term of 7½ years. Motion for new trial was filed, considered, overruled and the defendant has by petition in error with case-made attached appealed his case to this court for review.

J. L. Boyd, father of Thelma Boyd, the prosecuting witness in this case, stated he had lived near the city of Sayre for more than 22 years. He further stated:

"I know the defendant H. L. Jones; he picked cotton for me in the fall of 1928 and 1929, and has worked for me a greater part of this year; I think he worked about 35 days for me in 1935; he did not work steadily for me during the spring of 1935; he quit my employ on the 12th day of July, 1935; I fix the date by a check I gave him.

"Thelma Boyd is my daughter; she was 16 years old on the 12th day of August of this year, 1935; the last time the defendant worked for me he commenced about the first of July, 1935, and worked steadily from then up to the 12th; he roomed in a house about 20 steps from my house and ate on the cabinet in the kitchen because the house where he lived was not equipped for serving his meals. I called him Dank. The defendant worked for Mrs. Martin the day before he came to my house the first of July to work; his duties around the place was anything I had for him to do; he was a good hand, nice about the house and respected my family.

"I never inquired as to his reputation in the community but so far as I know it was good; I never heard him swear, and if he took a drink I do not know it; we did not have a stove in the little house where he lived and if it was very cold he stayed in the house; he helped my children with their lessons in school when he first came there. I had Dr. Windle examine my daughter."

Dr. Windle testified:

"I am a practicing physician; I examined Thelma Boyd about the 30th day of September, 1935; they brought her to me and wanted me to see if she had been ravished; I made an examination and found there was no hymen or what is commonly called maidenhead; from my examination I found she had had intercourse with a man."

On cross-examination Dr. Windle stated:

"There was no bruises or abrasions, nothing but scar tissue all healed over that was caused by intercourse; the remainder of the female organs did not show any signs of violence."

Ed West, testifying for the state, stated:

"My name is Ed West; I am sheriff of Beckham county; about the 30th day of September, or a little later I arrested H. L. or Dank Jones, on a charge of rape and brought him to jail; later I took him to the county attorney's office; when I got there with Jones, the county attorney, John Richardson, myself and the defendant were present. The defendant made a statement after he was informed of the charge against him. He stated he was not guilty of raping Thelma Boyd; he was asked if he had ever had intercourse with her and he said he had had intercourse with her on two occasions; that when he had intercourse with her they were in the kitchen.

"McCreery, I believe, asked him once if he knew Ruby Boyd; both Ruby and Thelma's name was mentioned, the first one he asked about was Thelma; defendant denied he had raped Thelma Boyd; he stated there in our presence he had had intercourse with Thelma Boyd twice."

Thelma Boyd, the prosecutrix, stated:

"I live seven and three-fourth miles northwest of Sayre with my father and mother; there are two children in my family, myself and sister Ruby Boyd; I was 16 years old on my birthday, which was on the 12th day of August, 1935; last July I was 15 years old. I know this colored boy, the defendant in this case; I first saw him in 1928, at that time I was eight years old; he was picking cotton for my father; he again worked for my father in 1929; when he worked for my father he stayed in a little house near our house; in the summer of 1935 he was working for my father part of the time; if we happened to be going to church my sister and I would ride as far as the church with him, we did not just ride up and down the section line, nor did we ride or associate with him unless it was while he was driving some place, either to church or to town; he helped us with our lessons some, as he was an educated negro; he stated he had finished the eighth grade; he did not eat with my family, he ate on a cabinet in the corner of the room.

"About the first of July, 1935, about three o'clock in the afternoon I was in the bedroom lying down; my mother had gone to my grandmother's a short distance from our home. The defendant was plowing in the field near the house; about three o'clock he came to the bedroom door and asked where my mother was; I told him she had gone to my grandmother's; he came over to the bed and pulled up my dress and got on the bed with me: I started hollowing and he told me to hush; he had intercourse with me. I did not consent, it was against my will and consent; he did not threaten me nor did he say not to say anything about what had taken place; I did not tell it because I was afraid to; the defendant left our place about the 12th of July following this incident. He returned the last of September. I never told my mother about what had happened until just about the time the defendant came back; the reason I told her then I learned he was coming and and I did not want him to come, I was afraid of him.

"The defendant held one of my hands, he had his other hand over my mouth. The defendant here is the man who came to my room and held me and had intercourse with me; during all the early years the defendant worked for my father he was with us children and was good to us, and never did anything wrong all that time; when we started to school he helped us with our lessons. So far as I know his reputation in the community as a colored man was good. When he was working in the field, close to the house he would come to the house and get water, and when he was away from the house we would drive the car and take water out to him; we did not feel afraid to take water to him, he had never done anything at that time to make me afraid of him; he never did threaten me, always acted gentlemanly when he was around sister and I.

"If the defendant happened to be going the way mother was, when she was going to a neighbor's, he would drive her in the car. I don't know the day he had intercourse with me; I don't know that it was the first day of July, it was on Thursday; I don't know whether it was the last Thursday in June or the first Thursday in July; I can't get the idea of when it was as I don't know; if the first of July was on Thursday it was the first of July; I told Mr. McCreery it was some time near the first, never set no date at the preliminary trial as to when the defendant had intercourse with me. The time he had intercourse with me I was lying on the bed in the southwest bedroom; I don't remember where Ruby was that day, she could have gone to some of the neighbors, father was in the field working. Dank, the defendant, was plowing not very far from the house and not very far from grandmother's house; the rows he was plowing ended between our house and my grandmother's house.

"The first time I saw the defendant on that afternoon he came to the bedroom door; it was not his custom to come into the house; he could see the house from where he was plowing; when he came to the door he asked me where mother was and I told him she was at my grand-

mother's; he did not say anything, he walked from the door across to the bed; when he reached the bed the first thing he did was to pull up my dress and I hollowed; I don't know how loud I hollowed; I did not hollow as loud as I could, I don't suppore. When I hollowed he told me to hush, and I hushed; he pulled down my underclothes to my knees and just proceeded; he had his hand over my mouth at that time; in a little while after he told me to hush he took my hand and then proceeded to consummate the act. All this time he held one of my hands and for a little while he held one of my hands and the other hand was over my mouth. I don't know when I did with my legs, I just layed there and did not make any effort or struggle to get loose; he talked in such a way and told me to hush that I was afraid of him; he did not threaten me or tell me he was going to hurt me, the only thing he said was he told me to hush; he did not treat me harshly. When the act was finished I was not in the same place on the bed I was when he came in; there was no struggle or violence on the bed with my hands held; the bed was not torn up; there were no marks on my body, my clothes were not torn, they were wrinkled; at the time of the act he hurt me; I had pains after it was over.

"I did not tell anyone what had happened until I told my mother the latter part of September, 1935. My mother had been a good mother and always had confidence in me; my father has been a good father; I did not tell my sister, but it was not for the reason that I was afraid she would tell. I have not talked to the county attorney, but I have talked with Mr. Ivester; I told him what he asked me. My sister is at Plainview, Tex., at this time."

The foregoing is the substance of the state's testimony.

Dr. T. J. McGrath, called as a witness for the defendant, stated:

"I live in Beckham county; I am a practicing physician; I know Joe Boyd; I am not his family physician. On the examination of a female where the hymen is miss-

ing or obliterated and there are no bruises or abrasions I could not determine what caused the obliteration."

Dr. Stone, testifying for the defendant, stated he was a regular licensed practicing physician. He stated in substance the same as Dr. McGrath. Dr. Stone in answer to a hypothetical question stated where there were not any lacerations or abrasions he could not tell the cause of the missing hymen.

The defendant, testifying in his own behalf, stated:

"My name is H. L. Jones; on the first day of July, 1935, I was employed by Mr. Martin and worked for her all day; started to work for Mrs. Martin on the 17th day of June; I came back to town Saturday night and went home; I worked at Mrs. Martin's until Friday night, the 28th of June, and then went over to Boyd's; I called out there before I left town to see if there was anything to do; he said Howard Bowen wanted me to work for him Saturday, which was the 29th. I worked for Mrs. Martin on the 30th of June, which was Monday, and went out to where I lived about 10:30 that night.

"On the second of July I began plowing for Mr. Boyd and plowed until fifteen minutes until twelve, and Mr. Boyd got on the tractor and plowed until one o'clock; there is a little field up east of the house, about 12 or 14 acres of cotton; I plowed until about sundown. Wednesday morning I plowed south of the house, that was the 3rd of July, and went across the highway on the south side of the highway and west of the house and plowed until about six or seven o'clock. Mr. Boyd came up and was going to the pasture to get the cows, he asked me if I was tired and I told him no, and he told me to take the car and go back to the house and take the cows; that was on the 3rd of July; I took the car and Mr. Thresher's son, he gets in the car with me and rides to where I turn this way—I let the boy out, and he drives the cows and I went on to the house.

"While I was plowing Mr. Boyd chopped cotton; I was plowing south of the Boyd home Wednesday morning; there are some short rows that ran kindly south and west of the house; we were going to plow at night because Mr. Boyd wanted to catch up with his work.

"Wednesday morning the tractor oil had water in it and the oil would not burn; I was standing on the east end of the field and Mr. Boyd was going to town. On the 4th of July I was plowing on the east and south of the house, went to the house and ate dinner and went back to the field; the rows run right up against the fence to Bonnifields place; I plowed until sundown and got over all of that piece. Mr. Boyd was chopping cotton. Thursday afternoon; I think Thelma chopped cotton; I am not positive whether Ruby chopped cotton, but I know Thelma chopped cotton while I was plowing. On the 5th I plowed cotton, and liked about 20 rows getting through; Ruby came to the field and brought me a half gallon of water; that was on the 5th of July. When I got to the house Mr. Boyd said I could come in and eat my dinner if I wanted to; I went on up and ate dinner and started back to the field and plowed until about four, and had some trouble with the tractor and had to go to the house.

"Mr. Boyd, Thelma, and Ruby were chopping cotton; I had to take the tractor apart and take part of it to town. Mr. Bowen came and asked me if I intended to work for him that day and Mr. Boyd said yes, so I did. That was the 5th of July. I did not go to town because my Bud had my car; Mr. Boyd and Ruby went to town and I told them to tell Bud to let them bring my car back. They saw John and told him about it, this was on Saturday, the 6th. On Sunday morning just before daylight Bud brought my car; I left there in a few minutes after he came, and went to B. W. Washington's and stayed a few minutes and came up to E. L. Martin's place on the 7th. On the same day I came back and dressed and went to Mangum; was gone all day.

"I was arrested on the 26th day of September, which is the last Sunday in September. I was taken to Mr. Mc-

Creery's office. I am not positive about the conversation, he asked me first did I know Thelma Boyd, and did I know Ruby Boyd, and did I know Mr. Boyd, and how long I had worked there. I told them I first picked cotton there in the fall of 1928. He then asked me if I remembered coming from the field and having intercourse with Thelma, and I told him I did not. He kept on talking a few minutes and asked me if I knew Ruby Boyd, and I said yes, and he asked me if I had ever taken them any place, and I told him I drove the car some times for them; he asked me if they ever told me about parties and I told him they did not. He kept talking about Ruby, and what kind of a girl she was, and I said so far as I knew I knew nothing about her; he asked me if I had intercourse with these girls, and I studied a few minutes and said, 'Well, yes, I have.' He did not say any more, and looked up and said that was all. I told him the intercourse was in the kitchen.

"I never did anything out there that would make these girls suspicious of me for one moment; I always respected the family and was permitted to drive the girls to different places; I tried to do everything I could to please them. On or about the 12th day of July, I left their place about 2:30 in the afternoon; I was going to Parksville, to Mr. Boyd's brothers, E. W. Boyd; I had received a letter from Mr. Boyd on the 12th, telling me that if I intended to come down and pick cotton he wanted me to be there by the 15th. Ruby brought the letter to the field where I was plowing. I made preparations to leave, and they packed my clothes and wrapped them up in a piece of paper; they were all clean. Mr. Boyd was at home at the time and so was Thelma.

"When I came back I came around to Oklahoma City and then to Sayre, and went out to Ben Richards and stayed a few minutes and went on to Ralph Godfries filling station, and called Mr. Boyd's and could not get anybody. That was the 30th of September. I went on out to Mr. Boyd's place where I stayed and went to bed, and Mr. Boyd did not come in and I went over to Mrs. Boyd's

mother's and asked her if she knew where Mr. Boyd was, and she said she did not, and I went back to the little house and layed down and went to sleep; one of the boys that was intending to pick cotton wanted to know the place they were going to and I told them it was down the road at the next house on the west and I layed down and one of the boys told me there were two men out there who wanted to see me. Mr. West was in the car. He did not have a warrant; he wanted to take me to town and talk to me. They brought me down here and put me in jail. When I talked to Mr. McCreery he told me this crime I was supposed to have committed along about July first."

The cross-examination of the defendant is materially the same as his direct examination, except the defendant stated he did not tell the sheriff he had intercourse with Thelma Boyd, nor did he tell the county attorney he had intercourse with Thelma Boyd.

"The sheriff did not ask me who I had intercourse with. In the conversation he asked about Ruby and I told him I had intercourse with her twice; I did not say it was Ruby or who; I told them I did not have intercourse with Thelma. I am 24 years old; I was born in Texas in 1910; I ate in the kitchen on a cabinet; they placed things on the cabinet and passed things from one to another; I did not sleep in their home. John Richardson, Ed West and Mr. McCreery were present in the county attorney's office."

Effie Salyer was called by the defendant, and testified she reported the testimony at the preliminary hearing, and stated it was a true, full and correct copy of the proceedings had at the preliminary.

Thelma Boyd was recalled to the stand by the defendant and questioned as to her testimony in the preliminary, and an effort was made to show that her testimony in the preliminary was contradicted by the statements made at the trial.

John Richardson was called in rebuttal to testify to the statements of the defendant when he was interviewed in the county attorney's office, and in substance his testimony is the same as that of Ed West.

The foregoing is the substance of the testimony for the defendant.

The defendant in his petition in error alleges eleven errors committed by the trial court, which he deems sufficient to warrant this court in reversing his case and granting him a new trial. The defendant has at length discussed his different assignments and urges that the case should be reversed for the errors assigned.

The testimony in this case on the part of the prosecutrix, Thelma Boyd, is positive that the defendant against her will and consent came to her bedroom and there by force had sexual intercourse with her. The witness states she was afraid to hollow, and did not for some time after the crime was committed tell any one because she was afraid of the defendant.

The testimony of Ed West and John Richardson shows they were present at the county attorney's office shortly after the defendant was arrested and heard a statement given by him in which the defendant denied that he had raped Thelma Boyd, but stated in their presence that he had had intercourse with Thelma Boyd twice.

Without extending this opinion to any great length or setting forth the argument of the defendant in full, we hold that the testimony of the prosecutrix, Thelma Boyd, is corroborated by the statement of the defendant made in the presence of Ed West and John Richardson, and the evidence, if believed by the jury, is sufficient to sustain the conviction. The jury by its verdict decided against

the defendant and evidently believed the statements of the prosecutrix true, that the defendant had intercourse with her against her will and consent.

The testimony shows conclusively that the defendant was working for the father of the prosecutrix, and had been associated with the family, first and last for several years, and when he was working near the house he would go to the house and get water, and that on one occasion he stated the sister of Thelma Boyd and her father went to town and he told them to get his car from his brother Bud, and the next morning before daylight the brother brought the car to where he was living. All of the circumstances, and the positive testimony of the prosecutrix, Thelma Boyd, and the confession made by the defendant in the presence of Ed West and John Richardson and the county attorney tend to establish the guilt of the defendant. The prosecutrix, Thelma Boyd, was under the age of 16 years at the time of the commission of the alleged crime, and the defendant was much older. All of the circumstances as well as the evidence conclusively show the guilt of the defendant. The evidence is sufficient to sustain the conviction.

After a careful examination of the record, without discussing the assignments of error separately and in detail, we hold the errors do not possess sufficient merit to warrant this court in interfering with the finding of the jury. The jury is the sole and exclusive judge of the evidence and its weight, and the credibility of the witnesses. Pickett v. State, 35 Okla. Cr. 60, 248 Pac. 352; Humberd v. State, 56 Okla. Cr. 23, 32 Pac. (2d) 954; Coats v. State, 56 Okla. Cr. 26, 27, 32 Pac. (2) 955; Clemmer v. State, 56 Okla. Cr. 354, 40 Pac. (2d) 37.

The defendant was accorded a fair and impartial trial. The instructions of the court taken in their entirety correctly advised the jury as to the law applicable to the facts. The judgment of the trial court is affirmed.

DOYLE and BAREFOOT, JJ., concur.