## MARKOFF v. STATE

(No. 2049; February 1, 1938; 75 Pac. (2d) 773)

458

For the plaintiff in error, there was a brief by *M. L. Cone* of Sheridan, *Wm. B. Cobb* and *C. M. Crowell* of Casper, and oral argument by *Messrs. Cobb* and *Crowell.*

For the defendant in error, there was a brief by *Ray E. Lee,* Attorney General; *T. F. Shea,* Deputy Attorney

*General;* and *Wm. C. Snow,* Assistant Attorney General, all of Cheyenne, and oral argument by *Mr. Shea.*

BLUME, Chief Justice.

Tony Markoff was convicted of assault and battery with intent to commit murder in the first degree upon the person of John Ruby. Judgment and sentence upon the verdict directed confinement in the penitentiary for a term of from twelve to fourteen years. He brings

error, assigning (1) that the verdict is not sustained by sufficient evidence; (2) that the corpus delicti was not proved; and (3) that certain requested instructions were refused.

1. On December 29, 1935, about 5:30 in the evening, Ruby, sitting at a table in the kitchen of his home at Sheridan, Wyoming, was wounded by a bullet which passed through a screen surrounding the kitchen porch, through the kitchen window-pane, and almost entirely through Ruby's head. The size of the perforations through screen and glass, and of the entrance wound in Ruby's head, indicated the missle to have been a 22-calibre bullet. Nine months later a 22-calibre bullet, identified as such, was extracted from Ruby's neck, at the side opposite the point of entrance.

There was no eye-witnesses to the shooting, and the main problem therefore is as to who was the assailant. Counsel for the defendant have eloquently and earnestly argued that the evidence wholly fails to show that the defendant was the guilty party, and that it at most but casts a suspicion upon him. There are a number of circumstances tending to show that the defendant is guilty. These are easily separable, and we shall, accordingly, discuss them in that manner.

(a) John Ruby was married. His wife secured a divorce from him on November 25, 1935, a little more than a month before the shooting in question in this case. The decree of divorce provided for the payment by Ruby to his wife of $15 per month for the support of the minor child of the couple. It was further ordered that such payments should be secured by the assignment to a trustee of certain evidences of indebtedness amounting to the sum of $1600, and that in the event of Ruby's death, this sum should become the absolute property of the minor child. Two days after the divorce decree was entered, the defendant and the divorced wife were married, the child mentioned thereafter liv-

ing with the defendant and his then wife, and this wife brought with her from Ruby's premises certain furniture and live stock which had not been awarded her in the decree of divorce above mentioned. Ruby brought an action of replevin to recover the property, and about December 16th, 1935, he, in company with Sheriff Harwood, went to Markoff's residence to obtain possession thereof. Upon this occasion, as testified to by the sheriff, the defendant stated that "if that old man (meaning Ruby) doesn't stay away from here, I will blow his head off." It seems that the action of replevin brought by Ruby was successful. Counsel for the defendant argue that the facts and circumstances here outlined do not show any motive for the commission of the crime in question; that they were not adequate to produce a sufficient emotion for the purpose. Of course, what facts may not be adequate to that end for one man may be for another. It was said in Hendrickson v. People, 10 N. Y. 13, 31, that "we can never say the motive was adequate to the offense; for human minds would differ in their ideas of adequacy according to their own estimate of the enormity of the crime; and a virtuous mind would find no motive sufficient to justify the felonious taking of human life." See Wigmore, Evidence, (2nd Ed.) Sec. 389. The jury saw the defendant, his wife, and Ruby on the witness stand and were in much better position than we are to determine that point. We are not at all certain that the provision for the child in the decree of divorce above mentioned is of any importance. But that an ill-feeling between Ruby and the defendant existed is altogether probable by reason of the fact that defendant married Ruby's former wife just two days after the latter obtained a divorce. The action of replevin had a tendency to enhance that ill-feeling. Defendant, while denying the statement testified to by Sheriff Harwood, admitted that he stated: "If that old man don't quit bothering,

I will kick him off the place." Even if that was the statement actually made, it shows an ill-feeling. The evidence was clearly relevant and had a tendency to show motive, particularly in view of the fact that the exhibition thereof was recent. Wharton's Criminal Evidence, (10th Ed.) Sec. 863. The weight thereof, in the chain of circumstances, was for the jury. It does not appear that any other person had any motive for shooting Ruby.

(b) Defendant admitted that he had a 22-calibre rifle; that it was in his automobile between the rear and front seats, and had been there for some time; that he had cleaned the gun and that it was good and clean and well oiled. Defendant told the officers of this gun on the evening of December 29th, 1935, and it was delivered to the latter about eight o'clock. Sheriff Harwood testified that there were particles of burnt powder throughout the length of the barrel of the gun; that there was an odor of freshly burned powder. Chief of Police Hendrickson testified that he found that the barrel contained powder stains; that "you could smell the powder, had a very distinct odor, the odor of the shell explosion." This testimony, together with the fact that the bullet extracted from Ruby was of .22 calibre, and therefore was shot out of a gun at least of the general character possessed by the defendant was, of course, exceedingly damaging to the defendant, and he sought to show by the witness Allen that a person would be unable to detect a ʻfresh odor of burned powder in such a gun, except to a slight extent immediately after the gun was fired. But the weight of his testimony, and that of the others, was for the jury, and they evidently accepted the testimony of Harwood and Hendrickson, and we cannot say that they had no right to do so. And if their testimony was accepted as true, it is apparent, especially in view of the motive above mentioned, that more than a strong suspicion that the

defendant is guilty would be generated in the minds of the jury, unless an explanation were given. Counsel for the defendant argue vehemently that such explanation was given; that, in fact, the bullet taken from Ruby's head could not possibly have been fired from Markoff's gun. They base this upon the following facts: The bullet extracted from Ruby's head has a pronounced cup or cavity in the base. The witness Allen testified that in his opinion this was caused by being forced through a new or slightly used barrel—not at all corresponding with Markoff's gun. At the time when the rifle came into the hands of the officers on the night of December 29, 1935, four unexploded cartridges were found therein. These were afterwards fired, and the bullets showed no cavity as above mentioned. The State did not attempt to contradict Allen's testimony, or to explain how the cavity would be found in one bullet and not in the others. And the argument of counsel would have considerable weight were it not for the further testimony of the witness that many bullets are manufactured with the cavity in the base. The extracted bullet may, accordingly, have been one of that character. In fact, the witness was asked: "Then in so far as this particular bullet is concerned, which was extracted from the head of the assailed man, John Ruby, you don't pretend to tell this jury that that bullet was originally manufactured into the casing with a square butt, do you?" The witness answered: "No; I couldn't say whether that was manufactured or not in that way." Apparently the main reason which led the witness to believe that the extracted bullet was not Markoff's was the fact that the other bullets found and fired as above mentioned did not contain the cavity in the base, but had a square base. But such conclusion could not, without further explanation, be of any great value. That might have been different, if it had been shown, for instance, that only one kind of

bullets are found in any one particular batch. But that was not done. In fact, whether or not defendant had but one kind of bullets was peculiarly within his knowledge and his alone. He did not see fit to testify on the point. Hence nothing prevented the jury from concluding that the extracted bullet had been in defendant's possession before it was fired.

(c) Sheriff Harwood testified that soon after the shooting in question, he found some sixteen fresh tracks, made by a man's shoe, mostly in the snow surrounding John Ruby's premises; that on that evening he obtained the shoes which the defendant was then wearing; that they were about No. 10; that on the next day, about ten o'clock in the forenoon, he put the shoes into the tracks so found; that the tracks were then in the same condition as on the previous evening. Dr. Schunck, who saw the shoes put into the tracks, stated that they fitted "awfully well," and he further stated that the tracks at that time were frozen. Taking this testimony as a whole, if true, no great weight is to be attached to the argument that it had been thawing on the 29th of December. The following appears from Harwood's testimony: "Q. Did you use both shoes? A. Both shoes. Q. You found some left tracks. Did you or did you not? A. Yes. Q. And those were fitted in the right shoe as well? A. Yes." Counsel for defendant, accordingly, argue that "if the tracks were so indistinct that the officers were unable to tell whether the imprint was made by the right or left foot, they would be of no probative value." The state counters with the argument that the questions were not clear; that the "jury rightfully inferred from such questions and answers that the witness first made a comparison between the left foot print and the left shoe, and then made a check up with the right shoe in order to determine whether there was a distinction between the right and left foot print." If the term "fitted" used in one

of the foregoing questions were taken literally, there might be force in the argument of counsel for the defendant. But it is at least doubtful that the witness or the jury so understood it. The term doubtless was construed as meaning "put," or "attempt to fit." It would seem, rightly so. In any event, it is hardly probable that the witness meant to contradict himself, after he had testified that when he put the shoes in the tracks they fitted. Nor is the construction of defendant's counsel consistent with the testimony of Dr. Schunck, that the shoes fitted into the tracks "awfully well." We may admit that this evidence relating to the tracks and shoes would not alone be sufficient to convict the defendant. Prof. Wigmore calls attention to the fact that such evidence is apt to be weak, and that "popular looseness of thought is apt to overestimate the probative value," and that care should be taken in admitting such evidence. We think that sufficient care was taken in the case at bar so as to make the evidence admissible, leaving the weight thereof to the jury. Wigmore, Ev., (2nd Ed.) Sec. 415; Wharton, supra, Section 936; 30 C. J. 162.

(d)   The defendant sought to show an alibi. He testified to his whereabouts from about 5 o'clock in the afternoon of December 29, 1935, to the time when he was taken to the police station—a little after 7:30 o'clock in the evening of that day. His counsel concede that the jury had the right to reject this defense in view of the conflicting testimony. See 16 C. J. 777. An alibi is a legitimate defense. Wharton's Criminal Evidence, Sec. 333; 16 C. J. 979. At the same time, the evidence adduced by the defendant in that connection may be such as to cast upon it the suspicion that it is fabricated, and thus constitute a circumstance in showing the defendant's guilt. 16 C. J. 979. Wharton, supra, Section 743, states: "And while an alibi is a defense which is a constant safe-guard of innocence, it is pe-

culiarly susceptible of being fabricated as a shelter for guilt. It has hence been held that the getting up by the defendant of a fictitious alibi by false impersonation is admissible against him on the trial, though such a defense must not be treated as necessarily involving guilt." We think that the jury in the case at bar were not unjustified in treating the defense of alibi in this case as one of the character above mentioned. In the first place the defendant testified that he shaved about 6:45 of the evening of December 29, 1935. His shaving brush was examined by officers a few hours thereafter, and the state's testimony tends to show that the defendant told a falsehood as to the time when he shaved. Verne Carter, one of the main witnesses for the defense to prove the alibi, testified that the defendant came to his place of business a little after 5:30 of the day in question and stayed until 10 minutes after six o'clock. But his testimony was impeached by the witness Harwood, who testified that Carter told him during the same evening that he had not seen the defendant on that day. The defendant testified that he left his house at five o'clock; was at the Sheridan Inn till 5:30; went from there to Carter's place of business, stayed until after six o'clock, went back to the Sheridan Inn, and then to his home. His wife's testimony did not agree with this, for she testified that he left the house at about 5:15, returned about 5:30, stayed three or four minutes, left and again returned at about 5:45, and at that time stayed until about 6:15, after which he left and was shaved.

Counsel for defendant argue, most earnestly, as already stated, that the facts and circumstances of which we have given an outline, are not sufficient to convict the defendant; that they at most merely give rise to a suspicion that the defendant might be guilty. They have called attention to a number of authorities. We need not review them. The facts therein were not

closely analagous to the facts in the case at bar. We need but to refer to the case which counsel claim is much like the case at bar, namely, Gill v. State, (Tex.) 38 S. W. 190. In that case the facts showing motive were much more remote than those in the case at bar. The only other circumstance shown was the correspondence of the size of defendant's shoes and tracks made in the neighborhood of the crime. Even that correspondence was shown much more imperfectly than in the case at bar. Such case cannot serve as a guide in deciding this case. Counsel argue that the evidence in this case against the defendant is made up of inferences based upon inferences and presumptions upon presumptions. We do not think so. Certain definite facts were shown, as outlined above; these definite facts constitute links in the chain of circumstances. We stated in Lampitt v. State, 34 Wyo. 247, 267, 268, 242 Pac. 812, that circumstantial evidence is not like a chain which falls with its weakest link, but is like a cable. The strength of that cable does not depend upon one strand, but is made up of a union and combination of the strength of all of its strands. In fact some of the strands themselves in the case at bar are strong, and taking them all together, we think that the jury were justified in finding the defendant guilty. It is easy enough in any case of circumstantial evidence to point out the weakness of any one strand, and with that as a start, argue the inconclusive character of the evidence. Counsel point out that this and that circumstance could well be construed as consistent with the innocence of the defendant. But that argument is not in itself sufficient in this court. Bryant v. State, 7 Wyo. 311, 51 Pac. 879, 56 Pac. 596; Jenkins v. State, 22 Wyo. 34, 134 Pac. 260, 135 Pac. 749. We pointed this out in the case of State v. Wenger, supra, a case of circumstantial evidence, and giving rise to the same questions of doubt as the case at bar. We think that counsel's arguments

on the point now under consideration are fully answered by what we said in that case, namely:

"The evidence tending to show the defendant's connection with the arson, too, was wholly circumstantial, and it is insisted that it was not sufficient to show that he is guilty of the crime with which he is charged. It is true, as claimed, and as charged by the trial court, that the evidence to convict the defendant herein must be sufficient to show, to the exclusion of every other reasonable hypothesis, that he is the guilty person. But the determination of that fact is primarily for the jury. Counsel seems to be under the impression that this court must likewise be able to say that, even though we have but the cold record before us. But that is not so. True, this court is the ultimate tribunal to say whether or not the facts shown in the case are legally sufficient to satisfy the criterion of law applied in such cases. And that is sometimes a delicate task. It is at times difficult to either answer in the affirmative or the negative. It has not been easy in the case at bar. But mindful as we are, and as we must be, that a defendant should not be convicted unless he is guilty beyond a reasonable doubt, still we must also be mindful of the rights and security of society. Nor must we forget that the constitution and the laws have granted the primary right to determine the facts to the jury. And simply because this court cannot definitely determine, from the cold record before it, that the defendant is guilty beyond a reasonable doubt, does not necessarily give it the right to set the verdict of the jury aside."

2. It is argued that the corpus delicti has not been shown; that it may have been a stray bullet which hit John Ruby. The corpus delicti in this case is the unlawful and intentional shooting of John Ruby. Twice before, we have been called upon to meet an argument similar to that in the case at bar, namely in Thompson v. State, 41 Wyo. 72, 283 Pac. 151, and in State v. Wenger, supra. In the Thompson case, the corpus delicti was the killing of the deceased as the proximate result of a collision with an automobile unlawfully driven by the defendant. In that case we stated:

"But that point (the corpus delicti) need not necessarily be shown by testimony independent of that of the identity of the offender or of his guilt. * * * We seem to have a peculiar situation in this case. No one saw an automobile strike the deceased, and the proximate cause of his death and the corpus delicti seems to depend primarily upon the question of the identity of the offender, for unless it was the defendant who ran over the deceased, there would seem to be little, if any, evidence that the deceased was run over by an automobile at all."

In the case of State v. Wenger, supra, an arson case, in which no one saw the commission of the crime, we pointed out that the facts and circumstances which tend to prove the corpus delicti are often interwoven and considered with those which connect the accused with the crime. And we held the corpus delicti to be proved. These decisions, we think, dispose of the foregoing contention. If the defendant shot Ruby—as the jury found—then the circumstances were sufficient to justify the jury to also find that the shooting was unlawfully and intentionally done.

3. The defendant asked the court to instruct the jury that if it appeared under the evidence in the case that any other person might have been guilty of the crime instead of the defendant, and that the circumstances against the defendant might be reconciled with that theory, they should find the defendant not guilty. The court refused to so instruct, and this is assigned as error upon the authority of Thompson v. State, supra, in which we held that a refusal to give an instruction similar in effect was reversible error. We do not think that the case cited is in point herein. The circumstances in that case pointed to someone else as the responsible party as much as to the defendant, and in fact more so. There is no evidence in the record in this case pointing to anyone else as the party who might have been guilty, and hence there was nothing upon

which the requested instruction could have been predicated. The trial court, accordingly, committed no error in this respect. Pittman v. State, 148 Ala. 612, 42 So. 993; Ex parte Hill, 211 Ala. 311, 100 So. 315; Ledlow v. State, 221 Ala. 511, 129 So. 282.

4. The court instructed the jury on circumstantial evidence, and told them among other things that "before you can convict the defendant in this case upon circumstantial evidence all the facts and circumstances essential to the conclusion of his guilt must be shown beyond a reasonable doubt, must be consistent with each other and must, beyond a reasonable doubt, be in harmony with his guilt and inconsistent with his innocence." Defendant does not complain of this instruction, in so far as it goes, but believes that he was entitled to have it amplified and clarified, and he, accordingly, asked the following instruction, which the court refused to give:

"You are instructed that in cases of circumstantial evidence the jury must not only be satisfied beyond a reasonable doubt that all the circumstances proved are consistent with the defendant having committed the act, but they must also be satisfied that the facts are such as to be inconsistent with any other rational conclusion than that the defendant is the guilty person. If there is any one single fact proved to the satisfaction of the jury by a preponderance of the evidence, which is inconsistent with the defendant's guilt, this is sufficient to raise a reasonable doubt and the jury should acquit the defendant."

The complaint is directed to the fact that the last sentence in this instruction was not given. Indirectly the court had already mentioned the substance of it by referring to *all* the facts. The sentence in question merely directs attention to each *single* fact. We have not been furnished, either by the State or the defendant, with any authority directly in point, whether the jury should or should not have been instructed as

asked. The question is not altogether free from doubt. In the case of Dunn v. State, 166 Ind. 694, 78 N. E. 198, a refusal to instruct the jury to the effect that if any one fact necessary to the conclusion of guilt is wholly inconsistent with the hypothesis of guilt, it breaks the chain upon which circumstantial evidence depends, was held to be reversible error notwithstanding an instruction similar to the one which the court gave in this case. And if the requested instruction in this case means the same as the requested instruction in the Indiana case, then the case would be authority for reversing the judgment in the case at bar. After considerable reflection we have concluded that the instructions are not the same; that the requested instruction in the case at bar goes too far and that this fact—aside from the point as to whether or not the refusal to give it would be prejudicial—warranted the court in not giving it. Gardner v. State, 27 Wyo. 316, 196 Pac. 750, 15 A. L. R. 1040. It may be noted that the requested instruction in the Indiana case refers to any fact *necessary to the conclusion of guilt*. The requested instruction in the case at bar omits that, and refers to any fact whatever, whether necessary to the conclusion of guilt or not. In the case at bar, for instance, the defendant was calm and collected after John Ruby was shot; he stayed at home and did. not flee. These facts were clearly established, and in a broad sense at least are facts inconsistent with the defendant's guilt. In truth, counsel for defendant argue that very thing in their brief. But such facts did not entitle the defendant to an acquittal, if other facts showed, beyond a reasonable doubt, that the defendant is guilty. We think, accordingly, that the contention of counsel for defendant must be overruled, and finding no reversible error in the record, the judgment herein must be and is affirmed.

*Affirmed.*

RINER and KIMBALL, J.J., concur.