## ADOLPH WYATT v. STATE.

No. A-9351.   April 14, 1938.

(78 P. 2d 718.)

Homer Caldwell, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, P. J. The parties will be referred to in this opinion as they appeared in the trial court. Adolph Wyatt, the defendant, was by information charged with assault with intent to kill, was tried, convicted, and sentenced to a term of seven years in the state penitentiary. Motion for new trial was filed, considered, overruled, exceptions saved, and defendant appeals.

The state, to maintain its charge, called Earl Inman, who in substance testified:

"My stepfather has a pool hall business at 9 West Frisco, in Oklahoma City; Claud and Adolph Wyatt are my uncles; the night of the shooting I had been to a picture show and saw my Uncle Adolph on my way home about 10 o'clock; I went up to the beer garden with him, and then came back; I then went home where my mother was; I afterwards went back to the pool hall and saw my Uncle Adolph there; he came in with his gun; from the time I saw him at the beer garden until I saw him at the pool hall it was about 15 minutes; he came into the pool hall through the cafe; when Uncle Adolph came into the pool hall with his gun he started up like he was intending to shoot toward my Uncle Scottie; his other name is Claud; Claud was standing about three feet from the partition in the pool hall when Adolph came in; when Adolph pointed the gun at Claud he got a bottle and threw it at Adolph, he did not hit Adolph but hit me; I tried to prevent Adolph from shooting Claud, I swung on the barrel of the gun; I thought he was going to shoot him. Prior to that time my

uncle had told me he was going to kill Claud if he did not give him his keys. He did not have a gun at the time he told me what he was going to do if Claud did not give him his car keys; the gun he shot Claud with belonged to Claud; I do not know how the gun became broken; immediately after the shooting I kneeled over with my knee; I did not see Uncle Adolph strike Claud with his gun; at the time Adolph shot Claud he was standing with his arms down to his side; Uncle Adolph was about 15 or 20 feet away at the time he shot."

On cross-examination witness stated:

"When we went to the beer garden my uncle was trying to call a policeman to go and get his keys from Scottie; my Uncle Adolph claimed that Scottie had his car keys and would not give them up; I was not at the house when they had their first trouble, Uncle Adolph told me he was going to shoot Claud if he did not give him his keys; I had hold of the barrel of the gun, Adolph was holding it like he was fixing to shoot a rabbit or something, he had the gun up to his shoulder; I did not have hold of the gun at the trigger when it was discharged; Claud threw only one bottle; when he threw the bottle the gun went off; I don't know if Nellie Rector threw any bottles; I did not shoot that gun or pull the trigger."

Nellie Rector Washington, testifying on behalf of the state, stated:

"I was at the pool hall at the time Claud Wyatt was shot; I was at Claud's house a short while before the shooting; there was a shot fired at the house by Adolph, the defendant in this case. After the shot was fired I left and went down to the pool hall; I saw the shooting at the pool hall by Adolph; I don't know what kind of a gun he used. I did not hear any conversation between Adolph and Claud Wyatt before the shot was fired; I do not know what happened to Claud Wyatt after the shot was fired as I left immediately. Claud and Adolph are brothers."

On cross-examination witness stated:

"I did not throw bottles at Adolph when he came in nor did I see Claud throw any; Claud was standing near the door and I was standing by the ice-box by the counter;

I did not see any bottles thrown that night; I was at the house at 111 West Frisco when the gun was taken; the names of the other parties there at the time were Lillie D. Green, Adolph and his sister Ruth and her husband, and another man, I don't know who he was. I did not hear any argument or know of any trouble at the house; I went up there to listen to the music; I am not a friend of Claud's wife; I did not go up there to see Claud and be with him; if Claud went out to get whisky I did not know it; I did not hear Adolph say to Claud, 'You get my money,' and say, 'I mean it,' then Claud say, 'I haven't got your money,' and Adolph say to him, 'If you will get it out of that woman's breast you will find the money'; I did not give the defendant the difference between a $5 bill and a bottle of whisky and put the money in my bosom, nor did I tell Adolph when he said he was going to search me that neither he or the policeman would search me, nor did I know where Claud was; I saw Claud at the house but I was not drinking any whisky."

Britt Jones, the next witness who testified for the state, stated:

"My name is Britt Jones; I am a brother-in-law of Claud and Adolph Wyatt; they are my wife's brothers; my place of business is located at No. 9 West Frisco; it is a pool hall; I sell soda pop and candy. The place of business faces south on Frisco, the eating place in the building is partitioned off from the soft drink part.

"I was on duty that night and saw Claud Wyatt; there was no one with him when he came in; Adolph was there also that night; he came in after Claud did; Claud and Adolph had a conversation in which Adolph asked Claud for his car keys; Claud told him when he paid for breaking his glass you can have the car keys. I understood the glass referred to was a glass Claud claimed Adolph had broken at Claud's house; I was talking to Adolph and said, 'What is the matter with you Claud, what is your trouble,' and Adolph says, 'He has my car keys and won't give them to me.' He went on out the same door he came in, and in about ten or fifteen minutes later Adolph came back the same way, and when I noticed him he was standing near the double doors that lead out on Frisco, he had a gun; when he came in with the gun the women commenced

screaming; he throwed the gun up (indicating) and that kid of mine broke for him, and Claud walked right over to this little place where the bottles were and grabbed one of the bottles and threw it at Adolph and struck the kid. The gun had been pointed at Claud before Claud got the bottle; Claud was standing back toward the partition that separated the cafe from the other place; when the gun fired Claud fell; when the shot was fired he looked up as if to protect himself; Claud had nothing in his hand at the time the shot was fired; after the shot was fired he fell down, and Adolph, the defendant, hit Claud with the gun and broke it."

On cross-examination the witness stated:

"Claud only threw one bottle and he did not think Nellie Rector threw any bottles. The bottle was thrown the gun was fired; when the bottle was thrown the defendant had the gun down like this (indicating) my boy was over by the ice-box standing pretty close to the gun, he was grabbing at the gun; I don't know exactly whether he had hold of it or not; the bottle Claud threw hit my son Earl Inman. I only saw Claud throw one bottle; I saw the defendant strike down this way, and I guess he must have hit Claud, he hit at him but I do not know whether he hit him or not; I know he shot him. After Claud was shot he fell on the floor and an ambulance was called and took him to the hospital. The gun fired just as soon as Claud threw the bottle."

Claud Wyatt, called on the part of the state, stated:

"My name is Claud Wyatt; the defendant, Adolph Wyatt, is my brother; I live at 111 West Frisco; Britt Jones is my brother-in-law; he runs a pool hall at No. 9 Frisco; I was at Britt Jones' place on the evening of October 24, 1936; the building at No. 9 West Frisco faces south; I came down to Britt Jones place of business about 9 o'clock; Adolph Wyatt, my brother, was not there when I got there; he came in later and asked me for his keys; I told him I would give him his keys when he paid me for the window he broke about ten minutes before he asked me for the keys. After this conversation he went out and when he came back he had a shotgun; I did not see him come in, somebody said, 'Look out,' and I looked up and saw him; I was standing back against the big door at the south end of the building;

he seemed to be waiving a bunch of people out of the way; he pointed the gun at me, and I reached down in the corner and came up with a pop bottle and threw it at him; I only threw one bottle. He had the gun up (indicating) like that, and when I threw the pop bottle at him he shot me; then I kept right on toward him; he shot me along there and across the eyes; my eye just felt like it was burned—I cant see out of it, the eye ball is gone. I got plumb to him and then fell down; I got a wound on the side of my head; after I fell down there I dont remember what happened; I had nothing in my hand at the time Adolph shot me; I threw my hands up, I saw he was going to shoot."

On cross-examination witness stated:

"I was not drinking; Adolph did not give me $5 to go and get some whisky; Nellie Rector was at my house while Adolph was there; Nellie was there just as she always is, visiting and listening to the music, she is not my special friend. The other parties were Natahiel Mayes, Ruth Mayes, Lillie D. Green, and I think that is all outside of Adolph; Adolph and I did not have a fuss at my house that night. I got his car keys right in front of my house out of the car; I dont know where he was when I got them; I cant explain how he came to have the gun, I did not know he had it; we were not quarreling over the shortage of change, nor were we wrestling over the gun at his house; I was not drunk. I heard the gun was taken to my sisters; it was shot on the front porch up in the ceiling of the porch. I did not throw a glass at Adolph and break a window; it broke at the time the shot was fired. I did not know who broke it; I demanded that Adolph pay me 85 cents for the broken glass before I would deliver him his keys; he was the only one that had anything to break the glass with; we did not fuss about the keys, he asked me for them, and I would not give them to him. After I left my house I went down to the pool hall; he came down to the pool hall and talked to me about the keys; I agreed to give him the keys after he paid for the window; I told him to get 85 cents to pay for the window, and said nothing about the gun. If Nellie Rector was in the pool hall when Adolph returned I could not see her; she did not ask for the car keys that night. No one but Adolph ask me for the car keys; some one said, 'Look out,' I got an empty bottle and threw it at him, I dont know whether I hit him or not; I only threw one bottle;

he was in the act of shooting; I never went out of the pool hall by myself after I was shot. I dont know whether I was hit with the gun after I was down or not. I did not realize anything after the gun went off; it seemed like I could not see, it did not seem like I had my senses at all; I dont know whether my brother intended to shoot me; he had the gun thrown on me; we had not been at outs prior to this time nor had we had any trouble, we were good friends. I hold no grudge against him by reason of the shooting. Just before I was called here I was up to the hospital to have my wounds treated. Ruth Mayes was at my house that night; she is my sister. While Adolph was at my house and discharged the shot gun I took his keys out of his car; he seemed to be drunk."

Adolph Wyatt, the defendant, testifying in his own behalf, stated:

"Claud resides at 111 West Frisco; on the night of the trouble I came by for him on my way to work because they wanted some body else during the holidays and I thought he wanted to make some extra money; I went by to get him to go with me to work; I work at 4212 North Walker; have worked there over four years; I am married and have seven in my family; when I got to Clauds he said he would buy a little drink before we went, and I gave him a five dollar bill to go and get something; he went and bought a pint; I did not have to go to work until 10 o'clock; Claud brought the whisky and poured some in the toddy glasses around the table, and I drank a toddy, and said, before I get too much of this I expect you had better give me my change back; Claud said he laid it there on the table, I said, 'Not since I have been here'; he said, 'Search yourself, and get up'; I said, 'It is not here,' and I got up and searched myself and did not find it, and he said, 'Maybe I laid it in here'; he walked into the other room and Nellie Rector followed him; I got up and peeped and saw him give her the money and she put it in her bosom; I seen it because I was looking behind the curtain; Claud came out and said, 'Did you find it,' and I said, 'I did not think you would do that'; she said, 'I haven't put anything in my bosom,' and I says, 'Oh, I will search you and show you'; she said, 'No, you aint going to search me'; I grabbed her by the arm, and when I grabbed her he threw a glass at me, and knocked the window out;

then he run up and hit me, hit at me and missed me; he was drinking, and he went and got the gun, and I got hold of it and was twisting it, and while I was twisting the gun the gun fired in the house; I got away from Claud and it made him mad and he ran out of the door, and I gave the gun to Lillie D. Green and told her to take it down to my sisters; I went with her as far as the corner; I went to get my car and he had taken the car keys and put them in his pocket; I came back to the car to go to work and I says, 'I will let it go, he will pay me'; he was standing nearby and I says, 'Boy, why did you take the keys,' and he says, 'I aint going to give you any keys until you give me 85 cents for the window you broke,' he says, 'You threw a glass and broke my window,' and he says, 'I aint going to give you the keys'; I said, 'If I had any work I would give it to you, and if you want to help me spare time you can do that and I will pay you 85 cents'; he says, 'Before the car is moved you are going to pay me the 85 cents'; and I says to Nellie Rector, 'You all have taken my money and you have taken my car keys, and you haven't any body to take care of and you should give me my money,' and I said, 'If you wont give me the money I will get a policeman,' and I went up to the beer garden on Robinson, and while I was on the way I met sisters little boy, Earl Inman, and I told him I was going to the beer garden to call a policeman to make Claud get my money and my car keys; I did not get the policeman; the boy said he would try to get a policeman for me; we came on down to the pool hall that is next door to sisters house, I don't know what the boy said, I met sister about ten or fifteen steps from the place and she asked me where I was going, and she said, 'I will go in and ask him,' and Claud said, 'I am not going to give the keys to him until I have the 85 cents for breaking the window'; I then went in and said, 'Claud, please give me my car keys; I cant pay for my groceries, I do get meat and things from the store,' and he says, 'If you will promise to give me the gun back I will give you the keys,' and I said, 'If you will do that I will even bring you the gun.'

"I went to my sisters and got the gun and come in the building with it; when I came in the building a little girl was right back of me and had hold of my coat tail and I was trying to get loose; I was angry because Claud had taken my money, and it made me a little nervous; this boy got

hold of the gun and then Claud came in with a pop bottle and hit me over the head; that is what he did and the gun fired; that is as far as I remember; he made at me but I dont know what he did; he is four year older than I am and I am used to him whipping me all along so I shot at him; he hit me this way, and at the same time the gun fired; I dont know how long the gun was pointed at him; he run at me while I had the gun like this (indicating) and then the gun bumped him on the head; I did not intend to shoot him. When the arresting officer told me I had shot him I did not know he was shot; I think he threw one bottle at me; when Inman hit the gun Nellie had some bottles and had hold of my coat tail and was hitting me with a shoe or bottle; I dont know what it was; I saw two bottles that Claud threw at me; I dont know how I shot him; my intentions were not to shoot him, I was pointing the gun and had no thought of shooting at him at all, and would not have done so for anything in the world; he did not fall down at my feet, he run at me and hit at me and I hit him with the gun; I stopped him with the gun I believe; when he hit me like this, and I had the gun like that (indicating) that is when the gun fell on the floor or wherever it fell. I did not hit him with the gun any more.

"I come out by the side door; Nellie Rector picked up a pop bottle and hit me after stepping out of the door; I did not make an unjustifiable assault upon him; he was hitting at me and threw two bottles at me, one struck me, and then I stopped him with the gun."

On cross-examination witness stated:

"Defendant identified the gun as belonging to his brother Claud. I sent the gun from Clauds house over to my sister; when I came into Britts place I came through the cafe on the west side of the building, then came in through the side door to Britt's place, the only way you can get in. I have been convicted once for assault to kill; I served in McAlester, in 1929."

Lillie D. Green, testifying for the state, stated, in substance:

"There were four of us at Claud's place, Claudie, Adolph, Lessie Reese and myself; we drank some whisky and Adolph said to Claudie, 'You have got my money,' and

Claudie said he hadn't; they got to tussling over the gun and the gun fired and they break out a window and so Adolph Wyatt goes to get in the car and the car keys are gone; the gun was taken down to the defendant's sister; Claud said, 'If you will give me the shot gun I will give you the car keys.' Adolph starts off after the gun and I saw no more of it. I could not say Claudie was drunk; he was drinking; he was staggering; whether he was drunk or not I could not say. Adolph told me to tell Claud he did not want Claudie to hurt him."

On cross-examination Lillie D. Green stated:

"I took the gun down to Adolph's sister's house; it had been fired once. I dont know who fired it. Adolph and Claudie were both tussling with the gun on the inside of the house; there was one shot fired. I went out of the door behind Adolph; he told me to take the gun down to his sisters house; I dont know how the gun got reloaded, nor do I know how many shells were in the gun."

Nellie Rector Washington, called in rebuttal, stated that the gun up at Claud's house was fired while the boys were on the porch:

"I was present at Claud's house all the time; I dont know anything about the whisky, I did not see any whisky; I was there but I was probably in his sisters room talking to her; I did not see any whisky."

Claud Wyatt, called in rebuttal, stated:

"I did not have any conversation with my brother at my house out near his automobile; the shot that was fired at my house was fired on the outside up at the ceiling. I dont know who fired the shot; I was not out doors at the time; I did not get a pint of whisky and bring it in there, nor did I get a half pint of whisky and bring it in the house."

The foregoing is the substance of the testimony of both the state and the defendant.

The defendant in his petition in error has assigned 16 errors alleged to have been committed by the trial court.

The first proposition discussed by the defendant is that the evidence is insufficient to support a conviction. With this contention we cannot agree, for the reason that the record shows that the prosecuting witness and the defendant, who are brothers, had a difficulty at the home of the prosecuting witness a short distance from where the shooting took place and a window light was broken out of the prosecuting witness' home; the defendant being charged with breaking it, and the prosecuting witness demanded payment for the same. The prosecuting witness got hold of a gun, and the defendant got hold of it, and in the scuffle the gun was discharged, and the defendant sent the gun down to his sister. When he went out to get in his car to go to his work, he found his brother Claud had taken his car keys and would not return them until he got his gun and pay for the window he claimed Adolph had broken.

Claud went down to his brother-in-law's place of business and the defendant went out somewhere to call a policeman to come and get his keys from his brother. While he was out on that mission he met a nephew, Earl Inman, who testified the defendant told him he was going to get his keys or he would kill Claud. The defendant then went to his brother-in-law's place and tried to get Claud to give him his car keys; Claud refused to do so, and the defendant left the room and in about five or ten minutes thereafter returned, coming in by the side door with the gun in his hands, and had it pointed at Claud; Claud threw a pop bottle at him, and the nephew, Earl Inman, says he got hold of the barrel of the gun and the defendant fired at Claud striking him in the face and destroying the sight of one of his eyes. Claud rushed at the defendant and the defendant struck him with the gun.

The defendant says he did not intend to shoot Claud, but the physical facts and his own testimony contradict that statement.

The jury heard the testimony for the state and the defendant, and found the defendant guilty of assault with intent to kill, and fixed his punishment at seven years in the state penitentiary. The testimony shows throughout the record that the defendant was the aggressor, and that he was determined to get his car keys, let the cost be what it may, and in so doing he shot his brother Claud without justification and without any action on the part of Claud attempting to take the life of the defendant or to do him great bodily harm.

Section 3062, O. S. 1931, Okla. St. Ann. title 22, sec. 834, in part is as follows:

"The questions of fact are to be decided by the jury."

The jury found the defendant guilty and assessed his punishment. Under the law and the facts, the verdict of the jury should not be set aside. Powell v. State, 11 Okla. Cr. 615, 150 P. 92; Queen v. State, 35 Okla. Cr. 412, 250 P. 935; Clemmer v. State, 56 Okla. Cr. 354, 40 P. 2d 37; Houston v. State, 63 Okla. Cr. 49, 72 P. 2d 526; Coppage v. State, 62 Okla. Cr. 325, 71 P. 2d 509; Goodnight v. State, 62 Okla. Cr. 382, 71 P. 2d 789, and Ely Sarratt et al. v. State, 64 Okla. Cr. P. 274, 77 P. 2d 1188.

The second assignment argued by the defendant is, the court erred in giving the following instruction to the jury:

"Under the laws of the state it is a felony for anyone to assault another with intent to kill by means of a dangerous weapon, such as a gun, either by shooting or by striking and beating, so, then, if the state of Oklahoma in this case shows to you by competent evidence, beyond a reasonable doubt, that in Oklahoma county, state of Oklahoma, on the 24th day of October, 1936, that this defendant did unlawfully, wilfully and feloniously make an assault upon one Claud Wyatt with intent to kill him, with a certain weapon, to wit: A shot gun, by shooting and striking and beating him, as charged in the information, you should then and in that event return a verdict of guilty against him. But upon the other hand if you entertain a reasonable doubt of

the defendant's guilt upon that charge you should give him the benefit of that doubt and acquit him thereon."

The defendant further, in his third proposition argued, alleges the court erred in not properly instructing the jury as to the law. We have carefully examined the instructions of the court and do not find any error in the instructions when taken in their entirety that would warrant this court in reversing the case.

Section 3206, O. S. 1931, 22 Okla. St. Ann. § 1068, is as follows:

"No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

After an examination of the entire record, it does not appear that the error complained of has probably resulted in a miscarriage of justice or constituted a substantial violation of the constitutional or statutory right of the defendant.

The next question to be considered is the question, argued by the defendant, that the verdict is excessive, is not responsive to the issues, and is not supported by the law. The defendant in this case insists that the verdict in this case is excessive for the reason that this was a row between brothers, and the record shows they had always been agreeable and friendly prior to the difficulty and since the difficulty, notwithstanding the prosecuting witness Claud Wyatt lost an eye by being shot by his brother, Adolph Wyatt; that seven years is excessive, and the judgment should be modified.

The defendant urges further, as a reason the judgment should be modified, that the court in its instructions did not differentiate between the manner of the use of the shotgun by shooting and by using it as a club. There is nothing to this argument for the reason that the record clearly shows that the defendant shot the prosecuting witness with the gun, and then further struck him with the gun.

Under the evidence in this case and the instructions of the court, the guilt of the defendant is clearly established. The defendant raises another question as to why this judgment should be reversed or modified, and argues at length that when the court submitted to the jury a form of verdict it had written across the top of the verdict, "Not over ten years," and the defendant insists that this was a suggestion to the jury and intended to indicate to it the court felt a verdict of guilty should be returned, and only left to the jury the fixing of the punishment. The defendant urges the severity of the punishment imposed on the defendant clearly shows the jury must have been influenced by the notation on the top of the verdict.

We cannot understand why the trial court permitted a form of verdict to be given to the jury with a notation on the top of the verdict, "Not over ten years"; ten years being the maximum punishment that could have been inflicted upon the defendant. We feel this notation could have influenced the jury in arriving at the punishment imposed upon the defendant. Considering that it was a friendly row between brothers, and that they are now friendly, and the notation on the form of the verdict, we find the punishment imposed is excessive, and should be modified from seven years in the state penitentiary to five years, and, as modified, the judgment is affirmed.

DOYLE and BAREFOOT, JJ., concur.