252 P.2d 524

## STATE v. BUCHANAN.

No. 7881.

Supreme Court of Idaho.

Jan. 14, 1953.

Black, Black & Oliver, Pocatello, for appellant.

Robert E. Smylie, Atty. Gen., William H. Bakes, Asst. Atty. Gen., and Hugh C.

Maguire, Jr., Pros. Atty., Pocatello, for respondent.

GIVENS, Justice.

Appellant assigns in substance three errors: first, that the record affirmatively shows no criminal complaint or warrant of arrest was ever filed in this action, or preliminary proceedings had before a magistrate. Such asserted lack or defect was in no way brought to the attention of the trial court and appellant's assertion in this regard appears for the first time in his brief.

The commitment, information and cross examination of witnesses as to their testimony at the preliminary examination, show a preliminary examination was held.

The only purpose of a warrant is to bring the defendant into custody and before the court, State ex rel. Schwanke v. Utecht, 233 Minn. 434, 47 N.W.2d 99; People v. Baxter, City Ct., 32 N.Y.S.2d 325. After the filing of an information, arraignment thereon—the defendant being present in court—subsequent trial and conviction, it is too late to urge error because the record in the district court does not disclose there was a warrant. State v. Main, 37 Idaho 449, 216 P. 731; State v. Jester, 46 Idaho 561 at page 567, 270 P. 417; State v. Frank, 51 Idaho 21, 1 P. 2d 181; Stamper v. State, 25 Okl.Cr. 324, 220 P. 67.

The second assignment urges the evidence is insufficient to support the verdict, particularly in that it does not prove deliberation, premeditation, malice aforethought or an assault with intent to murder. The information charged the defendant—

"* * * did then and there knowingly, wilfully, unlawfully and feloniously and with premeditation and malice aforethought, by means of a certain deadly weapon, to-wit: a loaded .38 caliber pistol, which he the said Albert Buchanan in his hands then and there held, did make an assault upon the person of one James Brown, a human be-

ing, by shooting said loaded pistol at the said James Brown, with the intent then and there wilfully, unlawfully, intentionally, feloniously, premeditatedly and with malice aforethought to kill and murder the said James Brown, which assault was likely to and could have produced great severe and mortal injury to the said James Brown."

Section 18-4015, I.C., proscribes assault with intent to murder and fixes the penalty therefor, thus:

"Every person who assaults another with intent to commit murder, is punishable by imprisonment in the state prison not less than one nor more than fourteen years."

Section 18-4001, I.C., defines murder as follows:

"Murder is the unlawful killing of a human being with malice aforethought."

and Section 18-4002, I.C., malice, as—

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

While Section 18-4003, I.C., makes two degrees of murder, there is but one punishment for assault with intent to commit murder, and it is murder to unlawfully kill a human being with malice aforethought. By Section 18-4001, I.C., there are not two degrees of assault with intent to commit murder, 40 C.J.S., Homicide, § 79, p. 942, nor is premeditation an essential ingredient thereof; therefore, while the information charged and the court instructed that before the jury could find the defendant guilty, they would have to find him guilty of premeditation, the same went beyond the requirement of the statute, and perforce was not prejudicial to the defendant, but was favorable to him—hence, not prejudicially erroneous. State v. Alcorn, 7 Idaho 599, 64 P. 1014, 97 Am.St.Rep. 252.

As argued by appellant, it is, of course, essential that the evidence justify the jury in considering it sufficient to convince them beyond a reasonable doubt the assault was made with intent to commit murder and with malice aforethought. Likewise, it is fundamental that a verdict of a jury will not be disturbed if supported by substantial evidence. State v. Bouchard, 27 Idaho 500, 149 P. 464; State v. Askew, 32 Idaho 456, 184 P. 473; State v. Bidegain, 34 Idaho 365, 201 P. 312; State v. Cacavas, 55 Idaho 538, 44 P.2d 1110; State v. Kleier, 69 Idaho 278 at page 284, 206 P.2d 513. Also, that the court is not authorized to substitute its judgment as to the credibility of witnesses and the weight to be given their testimony before the jury. State v. Abbott, 38 Idaho 61 at page 63, 213 P. 1024, 224 P. 791. So, it is not a

question of what evidence supports appellant's contentions, but what evidence supports the verdict.

The affray took place July 17, 1951, in the Porters and Waiters Club on South First Avenue in Pocatello, Bannock County, Idaho, about one-thirty or two o'clock in the afternoon.

The main room of the Club is L-shaped. Entering the door from the street, to the left is what might be termed an alcove or the base of the L and along the side thereof farthest from the door is a bar facing towards the street. In the main room or main part of the L were three pool tables extending lengthwise across the room; on the left side of the main room and at right angles to the other bar, separated at the angle by a partition about eighteen inches or so thick and several feet long—a juke box stood by this partition facing the entrance—was a bar and behind it or in the position of a back bar, cupboards and a closet. At the end of this bar nearest the partition was an opening or passage way between it and the partition, and along the front or customers' side of this bar were five movable stools. The first pool table was between these stools and the opposite wall; the other two tables parallel to the first and to the rear thereof. Evidently card tables were in the front of the main room to the right of the entrance from the street.

The salient features of the testimony and which the jury was at liberty to consider as true, and evidently did—as reflected in their verdict—are:

That the defendant asked one Hill, who was seated at one of these card tables, for a light. Hill said he didn't have any lighter, whereupon the complaining witness took out his book of matches and gave it to Hill to hand to defendant, whereupon defendant said, "I want my cigarette lighter." Hill replied, "I haven't got it." Defendant then said, "Well, if you (Hill) haven't got it Jimmy (complaining witness) has got it." Complaining witness said, "I haven't got your lighter." "I don't know anything about your lighter. I don't care for a lighter." The complaining witness was then seated on the second or third stool to the right of the opening or passage way at the end of this bar and Frank Stevens was seated to his left, facing the bar. Defendant then went behind this bar, through the opening or entrance to the left end thereof, as above mentioned, into a small room or closet, where he secured a .38 caliber Smith & Wesson special revolver fully loaded, came back out through the entrance way or opening at the end of the bar with it in his hand. He raised his hand up, pointed the gun at complaining witness and said: "Give me my cigarette lighter, or I will kill you." The complaining witness said, "I haven't got your cigarette lighter." Defendant then raised the gun and said, "Give me my cigarette lighter, or I will kill you." Complaining witness again said he didn't have the cigarette lighter and pulled Frank

Stevens off the stool in front of him, the two men then scrambling on the floor. The complaining witness testified the gun was pointed at him. He ducked, the gun was fired and the bullet hit the floor evidently over or to the right of Brown and Stevens, who were on the floor, and ricocheted into the wall of the main room away from the bar and to the right of the pool tables. There was also testimony that immediately before the shot, complaining witness threw up his hand and said, "I haven't got your lighter, take my money." and he had money in his hand. The complaining witness crawled on his hands and knees along the floor by the side of the bar, scuttled to the entrance, and out on to the street.

Immediately after the shooting, defendant handed the gun to Jones, the bartender behind the bar. Jones testified that as he took the gun from defendant, he asked him if he wanted to kill some one about a cigarette lighter, and defendant replied that Brown, the complaining witness, had been in his pocket before. Kraut, witness for appellant, corroborated this statement by appellant.

While there was other testimony as to how defendant held the gun, how he appeared to be shooting it, etc., three pertinent, and which the jury were justified in considering controlling, features clearly appear from the above recital: that the defendant pointed the gun towards the complaining witness and shot it, missing him either because he was a poor shot or the complaining witness, in ducking and dodging behind Stevens and pulling him to the floor, was momentarily out of the line of fire; thus that an assault was made with a deadly weapon capable of inflicting great bodily injury; and third, the defendant, immediately after the shooting, was asked if he would kill a man for a cigarette lighter and in the place of disclaiming any such intention, but by way of justification of his actions, accused the complaining witness of having been in his pockets before.

Nelson, Chief of Detectives, July 17, 1951, observed where the bullet struck the floor and had ricocheted into the wall and in connection with Exhibit 2, which is a picture of the bar at which the complaining witness and Stevens were seated and shows the opening through which defendant came, thus testified:

"A. From the marks on the floor and the one in the wall would indicate that whoever fired this shot would be standing right at the end of this bar here (indicating). The bullet went downward, hit the floor, which is a hardwood maple floor, then ricocheted up into the wall of the building.

"Q. (Mr. Maguire, continuing:) I show you, Mr. Nelson, what has been marked as Defendant's Exhibit No. 2, and I will ask you if from your examination of the premises at the Porters and Waiters Club immediately following the shooting, a person could have,

—who would have been sitting on the first or second stool, or at least down toward the end of the bar, as reflected in the Exhibit No. 2, would have been, or could have been, in the line of fire as indicated by the bullet marks on the floor and the wall?

\* \* \* (Objection) \* \* \*

"A. The best answer I could give, from this photograph here (indicating), if the two persons were directly opposite this first stool here (indicating), this stool here, not this one (indicating), if they were right out in here (indicating) they would be in the line of fire with the gun that the shot was fired from the end of the bar.

"Q. If they were right out in here (indicating)? A. Yes; they would be in the line of fire.

"Q. They would be in the line of fire from a shot that would be fired up in here? A. From up in there (indicating).

"Q. When I say 'up in here,' I refer to the end of the bar, that entry way there, the corridor,—is that what you refer to, Mr. Nelson? A. Yes, sir.

"Q. Mr. Nelson, did you in the course of your investigation into this shooting have any conversation with Mr. Buchanan? A. I did.

"Q. Did Mr. Buchanan at any time every identify State's Exhibit 'A' as being his gun? A. He did.

"Q. And when was that? A. That was the following day, oh, around ten or eleven o'clock in the morning there in my office.

"Q. Who was present, Mr. Nelson, at the time you had your conversation with Mr. Buchanan? A. Just Mr. Buchanan and myself.

"Q. And where was this conversation? A. That was in my office at police headquarters here in the city of Pocatello, Bannock County, Idaho.

"Q. \* \* \* Did Mr. Buchanan admit to you at that time firing the gun? A. He did.

"Q. And he did state to you this was his gun? A. Yes, sir.

"Q. Is that right? A. Yes, sir."

The testimony is replete with similar explanations and illustrations by the witnesses as to the positions of the different parties, thus graphically portraying before the jury the re-enacted scene in a way, of course, which the record does not reflect because no points were marked on the Exhibits or otherwise, where the witnesses indicated they meant in testifying before the jury thus—by way of illustration:

"A. Well, this table here (indicating), was back this way (indicating). The edge of this table was over this, over where the bullet is.

"Q. So to let the jury see: So where this has been marked here (indicating), this pool table was over that,

as I understand it; is that right, Mr. Jones? The edge of this pool table was down somewhat over that? A. Well, I could show the jury.

"Q. Yes. That would be fine. A. This is the table here (indicating), and it was somewhere along in there (indicating), the table legs of the billiard table.

"Q. This right here (indicating), Mr. Jones, appears to be the bar stools, the end of the bar down from this there appears to be a bar stool there, and there is a bar stool, and there is a bar stool (indicating), now when you saw the picture taken where was the photographer standing? Was he standing over by the juke box, or where?"

The jury evidently gave scant credence to Kraut's reiterated assist to defendant that:

"A. Well, he was holind it down as if,—well, as if he was going to shoot in the floor or something, it seemed to me.

"Q. Pointed toward the floor? A. He just held it down like he didn't know he had a gun, or something like that,—just come out with it, you see."

*　　*　　*　　*　　*　　*

"A. No, he wasn't, to my judgment. I think the gun went off without him even knowing it was going off."

*　　*　　*　　*　　*　　*

"A. * * *, and as Mr. Buchanan comes around here with the gun in his hand,—you see he holds the gun,— well, to my knowledge of it, he holds the gun just like he don't know he got a gun in his hand."

Why should this Court so magnify such palpable conclusions as to overthrow the verdict of the jury when the jury saw and heard the witness and could thus adjudge the force and effect of his testimony first hand?

Mrs. Johnson, defendant's former wife and co-proprietor of the Club, testified on direct examination she didn't see defendant point the gun at complaining witness, but on cross examination, she testified the defendant's back was towards her and she didn't see Brown when the shot was fired, and she was excited. She described by indicating in the court room, where she (evidently behind the other bar) and the other parties were, and the jury would have been justified in considering since appellant had his back to her, she couldn't see where he was pointing the gun. Hence, her testimony that she didn't see defendant point the gun at the complaining witness, does not prove he did not. In any event, no more than a conflict arises in this regard from the testimony of Kraut and Mrs. Johnson.

That defendant was so close to complaining witness he could have shot him did not and does not as a matter of law negative defendant's intent to kill. Morton v. State, 180 Ark. 197, 20 S.W.2d 872.

Appellant cites as authority in support of his contention the evidence is insufficient, the following: 26 Am.Jur. 579, Par. 600. The pertinent portions of Paragraph 599, p. 579, are:

"An assault with intent to kill or murder involves the concurrence of two distinct elements, namely, an intent to take life and an assault or attempt to carry out that intention which falls short of consummation. * * * The crime of assault with intent to kill is complete when an assault is committed with intent to kill the assaulted person, even though the assailant is prevented from killing him by the intervention of an extrinsic agency."

"Par. 600. The gist or essence of the crime of assault with intent to kill or murder is a specific intent to take life. The mental element in this crime differs in no respect, it seems, from that requisite to the crime of murder, namely, malice."

"Par. 603. According to some authorities, it is essential to an assault with intent to kill or murder that an actual attempt be made to do physical violence, coupled with a present ability to carry it into effect. It has, accordingly, been held that the crime cannot be predicated upon the fact that the accused, while standing within shooting range, fired a gun at another with intent to murder him, if the gun is in fact loaded with a blank cartridge.

Some distinctions, however, have been criticized as calculated to extend immunity to the criminal, rather than to protect society. They, no doubt, relate to times past, when innumerable crimes were punishable by death, and courts were astute to discover means for evading unreasonable severity. To require a perfect adaptedness in the act performed, and in the circumstances surrounding the prisoner at the time, to accomplish what he meant to do, would do away with the doctrine of attempts, as a practical element in the law, almost entirely. It is, accordingly, the better opinion in this country that an offense of attempt to commit a crime is committed, although the criminal result of the attempt is not accomplished simply because of an obstruction, unknown to the aggressor at the time, in the way of the thing to be operated on. If one fires a shot at a point where he believes another to be, with intent to kill such other person, he he is guilty of an attempt to murder, although he was mistaken in his belief that the other person was at the place at which he aimed." p. 581.

Also, State v. Minousis, 64 Utah 206, 228 P. 574. These authorities announce, anent intent to take the life of the person assaulted,

" * * * that such specific intent may be proved by circumstantial, as well as direct, evidence, and that it

may be inferred from the acts and conduct of the accused, the nature of the weapon used by defendant and manner in which it was used, taken together with all the other circumstances in the case.

\* \* \* \* \* \*

"As to whether or not the specific intent existed in the mind of the accused is a question of fact to be submitted to and determined by the jury from all the evidence in the case and the inferences to be drawn therefrom, and is not a matter of legal presumption." State v. Minousis, supra, 228 P. at pages 576–577.

▆▆▆▆ 40 C.J.S., Homicide, § 79, p. 942, supra, likewise cited by appellant, merely reiterates there must be a specific intent to kill and—

"An inference of the requisite intent, in an assault with intent to murder, generally may be made from the unlawful use of a deadly weapon, provided it was used in a way to indicate an intention to kill. \* \* \*" 40 C.J. S., Homicide, § 79, p. 944.

"To constitute an assault with intent to murder, the act must have been done under such circumstances that, if death resulted, the homicide would have been murder, and according to the weight of authority it is immaterial whether it would have been murder in the first or second degree." 40 C.J.S., Homicide, § 80, p. 945.

The facts in People v. Alexander, 41 Cal.App.2d 275, 106 P.2d 450, 916, cited by appellant closely parallel the circumstances herein. The defendant and the person assaulted had previously been married; the wife had obtained an interlocutory divorce and the custody of their eight-year-old daughter. On the particular evening in question, defendant telephoned his wife asking to take the daughter to see the outdoor Christmas trees. The wife refused and the daughter, over the telephone, said she did not care to go. The specific details as stated in the opinion follow:

"'\* \* \* Well, if you won't let me have her I am coming out there and murder you, and I am not fooling, I mean what I say.' \* \* \* About a half hour later appellant appeared at the house where his wife and daughter were living. The front door opened into a hallway, to the left of which was a living room. A stairway enclosed by a balustrade led to an upper floor. A flight of three steps in the hallway and to the right of the front door led up to a landing, then a turn left with nine steps to another landing, then another left turn and five steps brought one to the second floor. The door bell was answered by a Mr. Daniels who was in the living room, who invited appellant in, but he refused, saying he wished to speak to his wife. Mrs. Alexander (appellant's ex-wife) came to the door but did not open the screen door. Ap-

pellant remained standing on the porch near the railing about eight feet from the door. The discussion was resumed about the daughter accompanying appellant to see the Christmas trees and he asked that the daughter be called. Mrs. Alexander objected, saying she did not want the child to stand out in the cold, and asked appellant to come in. He then replied, 'Averil, this is my last request to come out here and talk to me, or else,—' whereupon he put his hand in his overcoat pocket. He pulled out a revolver, and Mrs. Alexander turned and ran upstairs. She heard the screen door open, and after reaching the last five steps, she crouched on the stairs, and a shot rang out and a bullet passed near her head and imbedded itself in the wall on the other side of the stairway. Daniels, who was seated in the living room to the left of the hall, heard Mrs. Alexander running up the stairs and looked up and saw her on the stairs, and appellant standing in the doorway. He then heard the shot and saw appellant with the revolver in his hand. Daniels went toward the door and appellant told him to keep out of the trouble or he would be next. Daniels then kicked the door shut and jumped back into the living room. A Mrs. Kelsey, who was seated in the living room, heard Mrs. Alexander say, 'Bud, you wouldn't,' and heard her running up the stairs, and also heard Alexander say to Daniels, 'Don't come any closer, or I'll get you too.'

\*     \*     \*     \*     \*     \*

"As pointed out by appellant the crime here charged requires the presence of two intents, first, the intent to commit a violent injury, which is a necessary part of the assault. Sec. 240, Pen.Code. To establish this intent criminal negligence may be shown, and there seems no doubt that the element of the crime was established in the case. It is in establishing the specific intent to kill that appellant contends the People failed.

"Appellant points to his testimony wherein he declared his intention in taking his gun from his pocket was suicide; that he did not intend to harm his wife, and he did not aim the gun at her. As to this line of testimony the jury could, and evidently did, entirely disbelieve him.

"Furthermore, to show appellant did not intend to harm his wife, it is claimed appellant had the gun in his possession for over a month but had not attempted to use it, although his wife had left him and secured an interlocutory decree of divorce, and his daughter had apparently lost her affection for him. It is also claimed Mrs. Alexander was not particularly frightened by his speech or manner as he stood near the open door, and further it is

pointed out only one shot was fired from a gun capable of firing six shots. Also, after firing the shot he made no immediate effort to escape, standing on the porch a minute or two before leaving. Even these facts, persuasive as they appear under the able presentation by counsel for appellant are susceptible of interpretation, and the jury did not accept the view of appellant. The jury may have placed more emphasis upon the telephone message to Mrs. Alexander from appellant when he told her about a half hour before he arrived, 'I am coming out there and murder you, and I am not fooling, I mean what I say.' The jury may have recalled that appellant, before firing the shot, advanced about eight feet from the railing of the porch to a point near the door, and actually opened the screen door, and also, that as Mrs. Alexander crouched on the stairway near the second landing, the bullet came so close to her she felt the compression of the air. Appellant also said to his wife as he insisted she come out onto the porch to talk to him, 'Averil, this is my last request to come out here and talk to me,—or else,' and then started to withdraw the revolver from his pocket. The remark to Daniels by appellant immediately after the shot was. 'You keep out of this or you are next.' Upon his arrest the next day he gave a fictitious name. When asked by the police why he did it, meaning the shooting at his wife, he did not then say he had tried to kill himself, but said he had been drinking or he wouldn't have done it, and that he had been having trouble with his wife, and then asked if she was injured. None of these acts are conclusively those of an innocent man. The jury saw appellant upon the stand, they heard the witnesses, and were amply supported by the evidence, if they believed it, in finding defendant guilty as charged.

"As has often been said, an appellate court cannot substitute its judgment for the findings of the jury unless the evidence is so clearly false and unbelievable that reasonable minds may not differ upon its inherent improbability. We have no such situation.here." 106 P.2d at pages 452–453.

To the same effect is People v. Pineda, 41 Cal.App.2d 100, 106 P.2d 25, likewise cited by appellant.

The following authorities clearly hold the evidence herein is sufficient to sustain the verdict in every particular. Bryant v. State, 5 Wyo. 376, 40 P. 518; Hopkins v. State, 28 Okl.Cr. 405, 231 P. 97; Green v. State, 29 Okl.Cr. 131, 233 P. 244; Tennison v. State, 32 Okl.Cr. 257, 240 P. 323; Whitfield v. State, 45 Okl.Cr. 397, 283 P. 266; Bear v. State, 48 Okl.Cr. 382, 292

P. 373; Pryor v. State, 51 Okl.Cr. 92, 299 P. 245; People v. Weaver, 123 Cal.App. 347, 11 P.2d 69; State v. Lanam, 140 Kan. 434, 36 P.2d 966; Markoff v. State, 52 Wyo. 457, 75 P.2d 773; Wyatt v. State, 64 Okl.Cr. 194, 78 P.2d 718; People v. Fitzgerald, 51 Cal.App.2d 518, 125 P.2d 105; Woodward v. State, 52 Ga.App. 70, 182 S.E. 198; State v. Golden, Mo.Sup., 40 S.W.2d 1044.

The third group of assignments concerns instructions and requested instructions. Appellant assigns as error Instruction No. 5. This instruction first came before this Court in State v. Lyons, 7 Idaho 530, at page 537, 64 P. 236, and while criticized, was not disapproved. It was inferentially approved in State v. Moon, 20 Idaho 202 at 214–215, 117 P. 757. It was again considered and though criticized, was not disapproved in State v. Nolan, 31 Idaho 71 at 83, 169 P. 295; and was impliedly sanctioned in State v. Dong Sing, 35 Idaho 616 at page 630, 208 P. 860. Conceding that the instruction has been criticized, it has never been held prejudicially erroneous and we will not do so at this time.

Appellant assigns as error refusal of the court to give his requested Instructions Nos. 10, 13 and 14. Instruction No. 10 was fully covered in Instruction No. 19. Requested Instruction No. 13, so far as it was appropriate—the second sentence thereof is not appropriate under the charge of assault with intent to murder, because there are no degrees in this offense—was fully covered by Instructions Nos. 2 and 6. Requested Instruction No. 14 was fully covered by Instructions Nos. 4 and 15.

Judgment is affirmed.

PORTER, C. J., and TAYLOR, THOMAS and KEETON, JJ., concur.